UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY JANE EUSTACE, RUTH CHAPPEL, CONSTANCE RODD, and DERYL BLANKS,<br><br>    Plaintiff,<br><br>    v.<br><br>SPRINGFIELD PUBLIC SCHOOLS,<br><br>    Defendants. | Civil Action No. 17-30158-MGM |

MEMORANDUM AND ORDER REGARDING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 32, 37, 42, 47, 52)

May 29, 2020

MASTROIANNI, U.S.D.J.

Plaintiffs Mary Jane Eustace, Ruth Chappel, Constance Rodd, and Deryl Blanks ("Plaintiffs" or "Plaintiff") allege that Defendant Springfield Public Schools ("SPS," "the district," or "Defendant") violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (Count I); the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.* (Count II); and state non-discrimination law under Massachusetts General Laws, chapter 151B (Count III) and chapter 152, section 75B (Count IV). Plaintiffs have also brought a claim for declaratory judgment that Defendant's reliance on the Massachusetts Education Reform Act ("MERA"), Mass. Gen. Laws ch. 71, § 59B, in refusing to transfer employees to vacant positions as a reasonable accommodation is in violation of the ADA (Count V).

Defendant has moved for summary judgment on all claims. (Dkt. Nos. 32, 37, 42, 47.) Plaintiff has moved for summary judgment on its declaratory judgment claim. (Dkt. No. 52.) The court heard argument on the summary judgment motions on November 7, 2019. For the reasons below, Defendant's summary judgment motions will be denied as to Plaintiffs' federal claims except for Chappel's claims; granted as to Chappel's federal claims and all Plaintiffs' state claims; and denied with respect to Plaintiffs' request for declaratory judgment. Plaintiffs' summary judgment motion on its claim for declaratory judgment will be granted.

## I. BACKGROUND

The court provides a general overview of the facts here and will incorporate further facts relevant to its decision in the analysis itself. The court construes the facts in the light most favorable to the non-moving party, but ignores conclusory allegations, improbable inferences, and unsupported speculation in doing so. *Prescott v. Higgins*, 538 F.3d 32, 39–40 (1st Cir. 2008). Unless otherwise noted, the court bases the recitation of facts from the Statements of Undisputed Material Facts (Dkt. Nos. 54, 58, 60, 62, 64, 66, 68, 69, 70, 71).

Defendant SPS employs approximately 2,040 teachers in more than 60 schools in the school district of Springfield. SPS faces challenges that include: a high percentage of economically disadvantaged students (67% in 2015-2016); a high percentage of high needs students (78% in 2015-2016); and numerous reported assaults and/or batteries on staff (95, 92, 41, 35, and 30 in the five schools with the most reported assaults and/or batteries in 2015-2016 (D.'s Resp. to P.'s Req. for Production of Documents, Dkt. No. 60-2)). Some of SPS's schools are "alternative schools," where the student population presents more behavioral problems than in non-alternative schools.

All four Plaintiffs were teachers for SPS, members of the labor union Springfield Education Association ("SEA"), and subject to a collective bargaining agreement ("CBA") that included

provisions concerning the hiring, transfer, and promotion of teachers.[1] The CBA includes a policy whereby teachers wishing to transfer to another building for the next school year are directed to use the "voluntary Annual Transfer Process," which begins no later than April 15 of each year. The process requires a teacher to apply for positions she would like to transfer to for the next school year. The principal of the school to which transfer is requested considers and makes a decision on the applications received. The Annual Transfer Process is in essence an opportunity to apply for a new or different position within the district. The CBA indicates that "the convenience and wishes of the individual teachers will be honored to the extent that these considerations do not conflict with the instructional requirements and best interests of the school system and the pupils." (CBA ¶ A.3, Dkt. No. 36-5.) It also states: "the Superintendent may assign, transfer or reassign teachers, voluntarily or involuntarily, to a position(s) and/or a school(s) according to the operational needs of the School District and the educational needs of the students," and that "[t]he Parties recognize that transfer and reassignment of teachers, during the school year or at other times is sometimes necessary and/or desirable." (CBA § A.pmbl., Dkt. No. 36-5.)

Each of the four Plaintiffs sought reasonable accommodation from SPS for an alleged disability, specifically in the form of a transfer to a school that they currently did not work in. Plaintiff Rodd requested to be transferred from the Van Sickle Middle School because of her severe allergic response to mold in the Van Sickle building. Plaintiffs Blanks and Eustace requested transfer to a different school because of emotional distress—anxiety and depression in Blanks's case and PTSD in Eustace's case—that arose from working with the "volatile student population" of Balliet,

---

[1] There appears to be a different collective bargaining agreement covering teachers who work in SPS's underperforming schools that are managed by a third party, Springfield Empowerment Zone Partnership, Inc. ("SEZP"). *See, e.g.*, Stmt. Undisputed Material Facts in Support of Mot. Summ. J. on Rodd Claims ("Rodd SOF") ¶¶ 8–13, Dkt. No. 64. But the parties have not raised any argument that turns on the specific CBA that applies, so the court will treat them as one and the same for purposes of deciding the motions for summary judgment.

one of SPS's alternative schools. Plaintiff Chappel requested to be assigned to a part-time position teaching science after the elimination of her part-time job as an Instructional Leadership Specialist in science, which was a district job as opposed to a school-specific job.

In response to her request, each Plaintiff was advised that she could avail herself of the Annual Transfer Process to apply competitively for a vacant position in another school (or simply in a school, in the case of Chappel). SPS would not transfer Plaintiff unless the principal of a school to which transfer was desired approved Plaintiff for a vacant position. Some of the Plaintiffs received interviews with the principal of a school with a job opening, but none received a job offer. After not receiving job offers through the Annual Transfer process and being refused their request for transfer, all Plaintiffs stopped working for SPS.

## II. OVERVIEW OF ISSUES

The arguments raised by the parties are complicated. To orient, the court provides an overview of the issues and arguments before diving into a fuller discussion of the law and its application to the facts.

The motions for summary judgment turn in part on what is required under the ADA with respect to a reasonable accommodation of reassignment and in part on what the state education statute MERA requires. Defendant relies on cases holding that the ADA requires nothing more than the employer to treat a disabled employee in the same manner as any other employee when it has a non-discriminatory, best-qualified system in place. Defendant also argues that any obligation to preferentially reassign a disabled employee without following the usual procedure would be unreasonable and an undue hardship in this case because MERA gives the authority over hiring to principals as a way to improve accountability and the management and performance of schools. Accordingly, Defendant argues, to reassign a teacher would be unfair to the principal forced to

accept a teacher, unfair to the teacher who the principal would have hired instead, and an undermining of the system put in place by MERA.

Plaintiffs argue that the ADA requires employers to preferentially reassign a disabled employee to a vacant position, even if preferential reassignment violates the employer's established policy or procedure for filling in positions or even MERA. In support, they cite cases that hold that an employer cannot simply treat a disabled employee in the same manner as any other employee under a best-qualified system, showing a circuit split on the issue. With respect to MERA, Plaintiffs argue that MERA gives principals authority over the hiring of new employees but does not give them authority over voluntary transfers of existing SPS teachers from one school to another. In addition, Plaintiffs argue that even if MERA gives principals the authority over voluntary transfers, nothing in MERA prevents the district from setting a policy that directs principals to preferentially accept the transfer of disabled employees. Therefore, Plaintiffs argue, preferential reassignment of employees is not an unreasonable accommodation or an undue burden to SPS.

The parties also argue additional issues including whether a Plaintiff was disabled, whether a vacant position existed that Plaintiff could have transferred to, and whether Defendant is separately liable for a failure to participate in the interactive process meant to determine the appropriate accommodation.

Finally, the parties address Plaintiffs' request for declaratory judgment that "Defendant's reliance on M.G.L. c. 71, Section 59B of the Education Reform Act in refusing to transfer employees to vacant positions as a reasonable accommodation is in violation of the ADA." Plaintiffs again argue that the ADA requires the employers to preferentially reassign a disabled employee to a vacant position, even if preferential reassignment violates the employer's established policy or procedure for filling positions; and doing so here would not create an undue burden on SPS. Defendant argues that the relief sought is overbroad; the ADA does not give disabled employees a

"right" to reassignment to a vacant position; and, in this case, reassigning Plaintiffs without a

principal's approval is not reasonable on its face nor in the specific circumstances because MERA,

and the CBA that incorporates MERA, requires that a principal approve of any transfer or hire into

his or her school. Defendant also raises a question of preemption. It notes that if the court finds the

ADA requires SPS to transfer disabled employees even without a principal's approval, the court

must decide whether the ADA preempts MERA.

### III. SUMMARY JUDGMENT STANDARD

When ruling on a motion for summary judgment, the court must construe the facts in the

light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.

2003). Summary judgment is appropriate when "there is no genuine dispute as to any material fact"

and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is

"genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of

the non-moving party, and a fact is "material" when it might affect the outcome of the suit under

the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). The nonmoving party

bears the burden of placing at least one material fact into dispute after the moving party shows the

absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994)

(discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party "can forestall

summary judgment by presenting definite, competent evidence demonstrating the existence of a

genuine dispute about a material fact. . . . The mere existence of a scintilla of evidence in support of

the plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff." *Murray v. Kindred Nursing Centers West LLC*, 789 F.3d 20, 25 (1st

Cir. 2015).

## IV. LEGAL STANDARD

### A.      MERA

MERA, a state educational reform statute, was enacted in 1993 as a "comprehensive reform of our public schools meant to ensure[] that all of our children will be prepared to compete in the global economy." *School Comm. of Pittsfield v. United Educators of Pittsfield*, 784 N.E.2d 11, 17–18 (Mass. 2003) (internal quotation marks omitted). A major feature of MERA was to "significantly alter[] the management and accountability structures of public schools" so that principals had the power over hiring and firing of teachers and staff at their schools. *Id.* at 18. Later judicial decisions interpreted the principal's power over hiring of teachers to include approval power over voluntary transfers of teachers already employed in the district. *School Comm. of Pittsfield v. United Educators of Pittsfield*, 784 N.E.2d 11, 19–20 (Mass. 2003) (citing *School Comm. of Lowell v. Local 159, Serv. Emps. Int'l Union*, 679 N.E.2d 583 (Mass. App. 1997)). However, the court agrees with Plaintiff that the 2012 amendments to MERA overrode this judicial construction so that voluntary transfers are now primarily within the superintendent's authority.

"Prior to passage of the Reform Act, responsibility for hiring and firing teachers resided with the local school committees, . . . a process that the conference committee's report described as imposing bureaucratic and political barriers to reform." *Id.* (internal quotation marks, alterations, and citations omitted). As the Supreme Judicial Court of Massachusetts explained in 2003: "Under the Reform Act, the school committee retain[ed] the authority to establish education goals and policies for the schools in the district and the responsibility for hiring or terminating a school superintendent." *Id.* (internal quotation marks, alterations, and citations omitted). "Superintendents, in turn, [were] responsible for appointing school principals, while principals assume[d] primary responsibility for hiring, disciplining, and terminating teachers and 'other personnel assigned to the school,' subject to the 'approval' of their superintendents." *Id.* (quoting Mass. Gen. Laws ch. 71, §

59B). "The impetus for enhancing school principals' management authority was to increase their accountability." *Id.* "As described in the conference committee's report, Principals [were to] be put in charge of their schools with the elimination of school committee hiring and firing. With increased managerial powers over the day to day operations of their schools, principals [would] be held accountable for performance." *Id.* The "hiring" and "terminating" of school personnel as provided under MERA, was considered a "core statutory authority" of the principal that could not be abdicated. *School Comm. of Newton v. Newton School Custodians Ass'n, Local 454*, 784 N.E.2d 598, 605 (Mass. 2003).

Before the 2012 amendments, the state courts had construed a principal's power over "hiring" under section 59B to also include the authority to decide "voluntary transfers" into his or her school from elsewhere in the district, *Pittsfield*, 784 N.E.2d at 19–20 (citing *Lowell*, 679 N.E.2d at 585[2]), but to exclude the power over "involuntary transfers." They explained that a "'voluntary transfer,' . . . is an affirmative application made by an employee to move from one school to another. It is, in essence, an application to be hired for a new or different position." *Pittsfield*, 784 N.E.2d at 19. "In contrast, an 'involuntary transfer' is the movement of an employee from one position to another, not at the employee's request, but to satisfy the general staffing needs of the employer. In the case of the school district, it means the assignment of a school employee from one school to another to satisfy district-wide staffing concerns. Such an involuntary relocation decision is not the 'hiring' of an employee in ordinary parlance or within the meaning of § 59B . . . ." *Id.*

The principal's authority over "the actual, first-line determination of whom to hire," *Newton*,

---

[2] "Although the word 'hire' is not specifically defined, we see no reason why it should not be given its ordinary meaning, 'employ.' . . . Because it is apparent that the Legislature sought to give to school principals the power to select all teachers and staff assigned to their school, subject to the approval of the school superintendent, we conclude § 59B embraces transfers as well as new hires; otherwise, the principal's power of selection would be thwarted." *School Comm. of Lowell*, 679 N.E.2d at 585.

784 N.E.2d at 606, whether a new hire or a voluntary transfer, could not be abdicated to the superintendent or the school committee. In *School Committee of Peabody*, the Massachusetts Court of Appeals held that a provision, in which managerial authority to approve voluntary transfers was exclusively reposed in the superintendent, was invalid for not recognizing "the prior approval rights of the principal" and for being "inconsistent with [MERA]." 748 N.E.2d at 994. In *Lowell*, it held a provision that vested ultimate approval of voluntary transfers in the school committee infringed upon "the exclusive managerial powers of the school's principal and superintendent." 679 N.E.2d at 585; *see also Pittsfield*, 784 N.E.2d at 19 (discussing *Peabody and Lowell* as voluntary transfer cases). And in *Newton*, the Supreme Judicial Court held that although there had been a violation of the collective bargaining agreement in denying an employee a particular vacant position, the arbitrator could not order the principal to offer the position to the employee because it would be in violation of the principal's "core statutory authority." 784 N.E.2d at 605, 608.

In contrast, involuntary transfers were held to be properly within the authority of the school committee rather than the principal. *Pittsfield*, 784 N.E.2d at 19 (holding that involuntary transfers that relate to district-wide staffing are within a school committee's authority, in contrast to voluntary transfers that are a principal's prerogative). The school committee, therefore, could enter into collective bargaining agreements regarding how these involuntary transfers were handled, and a principal had to adhere to them even if the result was the transfer of an employee into the school without the principal's approval. *See School Comm. of Westport v. Am. Fed'n of State, Cty., and Mun. Emps., Council 93, Local 2667*, 810 N.E.2d 848, 850 (Mass. App. 2004) (upholding a district-wide seniority system that determined who remained employed in the district after the elimination of one of three district positions, despite the fact it would result in an involuntary transfer not approved by the principal); *Pittsfield*, 784 N.E.2d at 20 (holding that involuntary transfer of an employee to satisfy district-wide staffing concerns is within the school committee's statutory power to direct and bargain

over).

Further complicating this scheme, although the state courts repeatedly affirmed the principal's non-abdicable authority over voluntary transfers, they also made clear that a principal could be required to follow procedures established by the school committee in exercising that authority. They noted that "[t]he authority of a school committee to control district-wide personnel policy necessarily encompasses the prerogative, if the school committee so chooses, to establish procedures for carrying out its personnel policies." *Newton*, 784 N.E.2d at 605. These procedures were valid and enforceable "so long as it [did] not result in an abdication of . . . a principal's[] core statutory authority." *Id.* at 605; *see also Peabody*, 748 N.E.2d at 994 (noting as valid "provisions that establish procedures for applying for transfers and filling vacancies that do not encroach upon the powers to approve or disapprove reserved to principals and superintendents by G.L. c. 71, § 59B"). For example, although MERA gave "principals broad discretion to determine, among other things, whom to hire from a pool of available applicants," it left "intact the authority of the school committee, subject to standards established by the Board of Education, to determine the minimum qualifications, and hence the permissible pool, of applicants." *Newton*, 784 N.E.2d at 605 (upholding procedures that set out hiring factors that had to be considered by the principal, but who retained the ultimate decision on hiring). As another example, a school committee could enter into a collective bargaining agreement providing that vacancies be filled based on seniority, as long as the principal has prior approval. *Id.* at 606 (citing *Lowell*, 679 N.E.2d 583).

In summary, the state courts had held that, under MERA, the principal had the exclusive, non-abdicable prerogative to make the first-line determination over who is hired or voluntarily transferred into his or her school. However, as long as the principal retained this authority, a school committee could establish district-wide personnel policy that set out procedures for hiring and transfers.

Notwithstanding this history, Plaintiffs argue that the 2012 amendments to MERA, effective September 1, 2016, created a distinction that hiring is the responsibility of principals, subject to the approval of the superintendent, whereas reassignments or transfers are the responsibility of the superintendent, subject to consultation with the principal. The 2012 amendments added the following underlined language to section 59B:

> The superintendent of a school district shall appoint principals for each public school within the district at levels of compensation determined in accordance with policies established by the school committee. Principals employed under this section shall be the educational administrators and managers of their schools and shall supervise the operation and management of their schools and school property, subject to the supervision and direction of the superintendent. Principals employed under this section shall be responsible, consistent with district personnel policies and budgetary restrictions and subject to the approval of the superintendent, for hiring all teachers, athletic coaches, instructional or administrative aides and other personnel assigned to the school and for terminating all such personnel, subject to review and prior approval by the superintendent and subject to this chapter. Prior to any assignment to a school of a teacher previously employed in another school in the district including, but not limited to, voluntary transfer, involuntary transfer, reduction in force, and recall, the superintendent shall consult in good faith with the principal concerning the assignment and application of any collectively bargained for selection criteria. In the case of an assignment in connection with the involuntary transfer or recall of a teacher to another school, any collectively bargained for selection criteria shall include the factors set forth in the seventh paragraph of section 42. The principal of any school which requires an examination for student admission shall be solely and exclusively responsible for hiring all teachers, instructional or administrative aides and other personnel and for terminating all such personnel without the requirement of review or prior approval by the superintendent before such hiring or termination. This section shall not prevent a person from serving as the principal of 2 or more elementary schools or the use of teaching principals in such schools.

Mass. Gen. Laws ch. 71, § 59B (2012). Plaintiffs argue that the added language should be interpreted to mean that any transfers between schools, including voluntary transfers, are within the authority of the superintendent. The superintendent is required only to consult with the principal and not to obtain a principal's approval.

The court has not found any guidance in a state court decision that construes the amendment language or discusses whether the amendment overturned judicial precedent. "[I]nterpretation of a state statute is for the state court to decide and when the highest court has

spoken, that interpretation is binding on federal courts." *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 224 (1st Cir. 2004) (quoting *Salemme v. Ristaino*, 587 F.2d 81, 87 (1st Cir. 1978)). But "when a federal court is confronted with an unresolved question of state law, [its] job is to 'ascertain the rule the state court would most likely follow under the circumstances.'" *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 58 (1st Cir. 2020) (quoting *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir. 1996)). "When interpreting state law, a federal court employs the method and approach announced by the state's highest court." *Cahoon v. Shelton*, 647 F.3d 18, 22 (1st Cir. 2011). The Supreme Judicial Court has explained that the "language of a statute is interpreted in accordance with its plain meaning, and if the 'language is clear and unambiguous, it is conclusive as to the intent of the Legislature.'" *Comm. v. Gernrich*, 67 N.E.3d 1196, 1199 (Mass. 2017).

The court recognizes Plaintiffs' proposed interpretation would signify a substantial departure from the rule previously established by judicial precedent. But the language of the amendment clearly and unambiguously places voluntary transfers under the superintendent's power and diminishes the principal's role to one of consultation. It unmistakably groups "voluntary transfer" with other staffing decisions that did not previously require a principal's approval (involuntary transfer, reduction in force, and recall, which all implicate district-wide concerns). Defendant's construction, on the other hand, would essentially read out "voluntary transfer" from the sentence, contrary to the principle that "[w]herever possible, we give meaning to each word in the legislation; no word in a statute should be considered superfluous." *Int'l Org. of Masters, Mates & Pilots, Atlantic and Gulf Maritime Region v. Woods Hole, Martha's Vineyard & Nantucket Steamship Authority*, 467 N.E.2d 1331, 1332 (Mass. 1984). Accordingly, the court agrees with Plaintiff that voluntary transfers are within the superintendent's authority and responsibility, not the principal's, pursuant to the 2012 amendments to MERA that took effect in 2016.

**B.      Reasonable Accommodation Under Federal Law**

To prevail at the summary judgment stage on a failure to accommodate claim, a plaintiff must present sufficient evidence indicating (a) she is disabled within the meaning of the ADA's definition (b) she is a "qualified individual," meaning an individual who can perform the essential functions of the job, with or without a reasonable accommodation, and (c) the employer knew of her disability, yet failed to reasonably accommodate it. *Audette v. Town of Plymouth, MA*, 858 F.3d 13, 20 (1st Cir. 2017) (citing *Lang v. Wal-Mart Stores East*, L.P., 813 F.3d 447, 454 (1st Cir. 2016)).[3] "Failing to provide reasonable accommodations for a qualified employee's known physical or mental limitations constitutes discrimination, unless an employer can demonstrate that such an accommodation would impose an undue hardship." *Id.* (citing *Lang*, 813 F.3d at 454; 42 U.S.C. § 12112(b)(5)(A)). In addition, when a request for a reasonable accommodation is made, it "may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23-24 (1st Cir. 2004) (citing *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 262 n.11).

Claims under the Rehabilitation Act and under the ADA are subject to the same standards. *See Calero-Cerezo*, 355 F.3d at 11 n.1 (citing *Oliveras-Sifre v. Puerto Rico Dep't of Health*, 214 F.3d 23, 25 n.2 (1st Cir. 2000)) ("The same standards . . . apply to claims under the ADA and under the Rehabilitation Act."); *id.* at 19 ("[T]he case law construing the ADA generally pertains equally to claims under the Rehabilitation Act."). The court will generally cite ADA caselaw applicable to both types of claims for simplicity.

---

[3] Unlike for other disability discrimination claims, for a claim based on a failure to provide reasonable accommodations, a plaintiff does not need to show that her employer's actions were motivated by a discriminatory animus directed at the disability. *Id.* "Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability' . . . and no proof of a particularized discriminatory animus is exigible." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 263-64 (1st Cir. 1999).

For summary judgment, the parties dispute three issues regarding Plaintiffs' federal claims for reasonable accommodation: (1) whether a Plaintiff was disabled, (2) whether reassignment was a reasonable accommodation, and (3) whether Defendant is liable for a failure to engage in the interactive process.

        1.    *Disability*

A plaintiff must present sufficient evidence indicating she is disabled within the meaning of the ADA's definition. *Audette*, 858 F.3d at 20. The ADA defines an actual disability to be "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1).

The phrase "substantially limits" is "not intended to be a 'demanding standard' and should not engender 'extensive analysis'" in light of the ADA Amendment Acts ("ADAAA"). *Mancini v. City of Providence*, 909 F.3d 32, 40, 42-43 (1st Cir. 2018) (noting that Congress rejected the Supreme Court's stricter standard of "substantially limits" in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002) by enacting the ADAAA in 2008); *see also* 29 C.F.R. pt. 1630, App. ("Congress did not intend for the threshold question of disability to be used as a means of excluding individuals from coverage." (quoting 2008 House Judiciary Committee Report 5)); *id.* ("Congress expected that the definition of disability and related terms, such as 'substantially limits' and 'major life activity,' would be interpreted . . . expansively and in favor of broad coverage" (citing ADAAA § 2(a)(1)-(8) & (b)(1)-(6) (Findings and Purposes))).

"Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Usually, "an individual with a disability will be able to establish coverage by showing substantial limitation of a major life activity other than working" because "impairments that substantially limit a person's

ability to work usually substantially limit one or more other major life activities." 29 C.F.R. pt. 1630, App. And given the "relatively low bar created by the substantially-limits and summary-judgment standards," "a plaintiff's detailed description of his limitations, standing alone, often will be sufficient." *Mancini*, 909 F.3d at 44 (quoting *Williams v. Tarrant Cty. Coll. Dist.*, 717 F. App'x 440, 448 (5th Cir. 2018), which held that the plaintiff's detailed declaration on her trouble sleeping, thinking, focusing, communicating, and caring for herself sufficiently created a genuine dispute of material fact for whether her impairments were substantially limiting).

However, when a plaintiff's impairment substantially limits her only in working, the plaintiff has the more specific burden to show "a substantial limitation in [her] 'ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities,'" a requirement that survived the enactment of the ADAAA. *Mancini*, 909 F.3d at 42 n.6 (citing 29 C.F.R. pt. 1630, App.); *see also Woolf v. Strada*, 949 F.3d 89, 94–95, 95 n.36 (2d Cir. 2020) (concluding the requirement remained and summarizing other circuit cases holding the same). Pre-ADAAA regulations defined "a class of jobs" as being "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the employee's] geographical area," and defined a "broad range of jobs in various classes" as being "the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area."[4] The court notes a lack of clarity regarding how, if at all, a plaintiff's burden with respect to proving her inability to perform a "class of jobs" or a "broad range of jobs in various

---

[4] These definitions are no longer in the regulations because the Commission "removed from the text of the regulations a discussion of the major life activity of working," noting it was "consistent with the fact that no other major life activity receives special attention in the regulation and the fact that, in light of the expanded definition of disability established by the Amendment Acts, this major life activity will be used in only very targeted situations." 29 C.F.R. pt. 1630, App.; *see also Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 834–35 (10th Cir. 2011) (discussing the Commission's reason for removing the definitions).

classes" changed under the ADAAA. The Commission's own interpretative guidance suggests the

standard changed to something "more straightforward and simple"[5]:

> A class of jobs may be determined by reference to the nature of the work that an individual is limited in performing (such as commercial truck driving, assembly line jobs, food service jobs, clerical jobs, or law enforcement jobs) or *by reference to job-related requirements* that an individual is limited in meeting (for example, jobs requiring repetitive bending, reaching, or manual tasks, jobs requiring repetitive or heavy lifting, prolonged sitting or standing, extensive walking, driving, or working under conditions such as high temperatures or noise levels).

> For example, if a person whose job requires heavy lifting develops a disability that prevents him or her from lifting more than fifty pounds and, consequently, from performing not only his or her existing job but also other jobs that would similarly require heavy lifting, that person would be substantially limited in working because he or she is substantially limited in performing the class of jobs that require heavy lifting.

29 C.F.R. pt. 1630, App. (emphasis added) (noting that "[i]n analyzing working as a major life

activity in the past, some courts have imposed a complex and onerous standard that would be

inappropriate under the [ADAAA]").

The court notes that this guidance appears to be at odds with the decision in *Carothers v.*

*County of Cook*, 808 F.3d 1140 (7th Cir. 2015), cited by Defendant, which presents some similarities

to the situation of two of the Plaintiffs, Blanks and Eustace. In *Carothers*, the plaintiff worked in a

juvenile detention center and was involved in a physical altercation with a juvenile detainee. *Id.* at

1144. The plaintiff was diagnosed with an anxiety disorder that was exacerbated by exposure and

interaction with children and was advised to avoid working with them. *Id.* at 1145. However, the

plaintiff's request to not work with children was denied, and she alleged a violation of reasonable

accommodation. *Id.* at 1145-46. The Seventh Circuit held that summary judgment against the

plaintiff had been proper because she was not disabled under the ADA. *Id.* at 1148. The court

---

[5] The Commission's Interpretive Guidance is a source that the court may look to in interpreting the ADA. "Such administrative interpretations of the Act by the enforcing agency, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 672 (1st Cir. 1995) (internal quotation marks omitted).

rejected the plaintiff's argument that because her anxiety prevented her from interacting with juvenile detainees, she was significantly restricted in her ability to perform a class of jobs or a broad range of jobs. In rejecting the argument, the court held that being unable to interact with juvenile detainees involved only a unique aspect of the single specific job of working as a hearing officer at a juvenile correctional center. *Id.* at 1147-48. The court relied on *Powers v. USF Holland, Inc.*, which held that "[m]erely being unable to work as a specific type of truck driver, or for a specific employer, is not enough. Our sister circuits agree and have likewise held that a plaintiff is not disabled merely because he cannot perform a specific truck-driving job." 667 F.3d 815, 822-23 (7th Cir. 2011) (collecting cases). In *Baulos v. Roadway Exp., Inc.*, one of the examples cited by *Powers*, the employee was found not to be disabled, although his sleep disorder caused him to fall asleep while driving, because an inability to drive "sleeper trucks" did not disqualify him from "most other truck driving positions (class of jobs)." 139 F.3d 1147, 1153-54 (7th Cir. 1998).

The issue is not straightforward. What distinguishes a limitation on working a "class of jobs" from a limitation involving "only a unique aspect" of a job? A "class" is somewhat subjective: "a group, set, or kind sharing common attributes." *Merriam-Webster Dictionary*, http://merriam-webster.com/dictionary/class (last visited May 14, 2020). Truck driving positions make up a class of jobs, but arguably so do sleeper truck driver positions. Teaching is a class of jobs, as well as teaching science, teaching special-needs students, or teaching children versus adults. Moreover, neither *Carothers* or *Powers*, nor any other case the court has found, discusses the effect of the ADAAA on the requirements of the standard; whether the reasoning of pre-ADAAA cases can be relied on post-ADAAA; or the Commission's post-ADAAA guidance that a "class of jobs may be determined . . . by reference to job-related requirements that an individual is limited in meeting." The court therefore keeps in mind that the ADAAA was enacted to reset the standard for disability, and that the ADAAA itself provides the following rule of construction regarding disability: The "definition

of disability in this chapter shall be construed in favor of *broad coverage* of individuals under this chapter, to the *maximum extent* permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A) (emphases added).

### 2. *Reasonable Accommodation*

A plaintiff must present sufficient evidence indicating the employer failed to reasonably accommodate the plaintiff's disability. *Audette*, 858 F.3d at 20. To defeat summary judgment, the plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002) (citing *Reed*, 244 F.3d at 259). "Once the plaintiff has made this showing, the defendant[] then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.*[6]

The ADA explicitly provides that reasonable accommodation may include reassignment to a vacant position. 42 U.S.C. § 12111(9)(B); *see Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27 (1st Cir. 2001). In *U.S. Airways, Inc. v. Barnett*, the Supreme Court assumed that normally a request for reassignment to another position would be reasonable within the meaning of the statute. 533 U.S. at 403. It further noted that preferentiality, by itself, does not make an accommodation unreasonable— in fact, preferential treatment of disabled employees is necessary to effectuate the ADA. *Id.* at 397–98. But it held that reassignment in violation of the rules of a seniority system made the accommodation not reasonable, in the run of cases, specifically based on the disruption to concrete employee expectations created by the seniority system. *Id.*[7] As a consequence of the Supreme

---

[6] In addition, when an accommodation is not reasonable on its face, the plaintiff "nonetheless remains free to show that special circumstances warrant a finding that . . . the 'accommodation' is 'reasonable' on the particular facts." *Id.* at 405; *see Shapiro v. Township of Lakewood*, 292 F.3d 356, 360 (3d Cir. 2002) (providing a useful summary of the *Barnett* framework); *EEOC v. United Airlines*, 693 F.3d 760, 763 n.1 (7th Cir. 2012) (quoting *Shapiro*'s summary).

[7] The Court noted that a typical seniority system creates certain employee expectations such as "job security and an opportunity for steady and predictable advancement based on objective standards," encourages employees to invest in the company by "accepting less than their value to the firm early

Court's decision, a plaintiff cannot ordinarily prevail on a reasonable accommodation claim involving reassignment contrary to a seniority system (absent showing "special circumstances"[8] that show reasonableness "on the particular facts"). *Id.* at 404-05. Employers are not required to prove on a case-by-case basis that a seniority system should prevail, *id.* at 395, as would have been necessary if reassignment in a seniority system was reasonable on its face and employers accordingly were required to carry their burden under the "undue hardship" prong.

Since *Barnett*, employers have tried to analogize other policies to the seniority system to argue that reassignment in violation of those policies is not reasonable in the run of cases and that plaintiff's case must fail even without the defendant proving undue hardship. In particular, employers have argued that a policy of filling vacant positions through a competitive application process and selecting the "best qualified" applicant is akin to a seniority system. Circuit courts are split on the issue.

In *EEOC v. United Airlines, Inc.*, the Seventh Circuit rejected the argument that a "best-qualified selection policy" is the same as a seniority system in a case where the plaintiff sought mandatory reassignment. 693 F.3d 760 (7th Cir. 2012) (overturning circuit precedent). The court held that the employer could not claim mandatory reassignment was unreasonable simply because of its competitive, best-qualified policy and the disabled employee not being the best qualified. The

_____

in their careers in return for greater benefits in later years," and creates "employees' expectations of consistent, uniform treatment—expectations upon which the seniority system's benefits depend." *Id.* at 404-05. The court observed that reassignment of a disabled employee in violation of the system would introduce complex, discretionary elements that would undermine the benefits of the system and employees' reliance on it, making such accommodation ordinarily unreasonable. *Id.*

[8] Special circumstances could include the employer fairly frequently changing the seniority system or the system already containing exceptions so that one further exception is unlikely to matter. *Id.* at 405. *Cf. Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 137-38 (1st Cir. 2009) (citing *Barnett* in holding that the evidence showed special "MM" accounts were sometimes given to employees who did not meet the usual eligibility criteria for them and, therefore, giving a special MM account to the plaintiff could be a reasonable accommodation even if the plaintiff did not meet the usual qualifications).

court reasoned that equating a best-qualified policy or any other normal method of filling vacancies with a seniority system "so enlarged the narrow, fact-specific exception set out in *Barnett* as to swallow the rule." *Id.* at 764. It discussed the *Barnett* decision extensively, noting the *Barnett* Court's rejection of an anti-preference interpretation of the ADA and the Court's assumption that a request for reassignment is normally reasonable. *Id.* at 763, 764 n.3. The Seventh Circuit's conclusion then was that mandatory reassignment was likely reasonable, although it "suppose[d]" it was "possible" that something else (other than a best-qualified policy, which it had already considered) could be involved to make the situation more "comparable" to a seniority system. *See id.* at 764 & n.3.[9] The Seventh Circuit therefore left it to the district court to make the final decision on reasonableness. *Id.*

Other circuits have arrived at similar conclusions, both before and after *Barnett*. *See, e.g.*, *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1205-09 (10th Cir. 2018);[10] *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1164-80 (10th Cir. 1999) (en banc) (including extensive analysis of the statutory text and legislative history); *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1303-05 (D.C. Cir. 1998) (en

___

[9] "In this case, the district court must first consider (under *Barnett* step one) if mandatory reassignment is ordinarily, in the run of cases, a reasonable accommodation. . . . We do not believe this step will cause the district court any great difficulty. This is the very accommodation analyzed in *Barnett*. There, the Supreme Court 'assume[d] that normally such a request would be reasonable within the meaning of the statute, were it not for one circumstance, namely, that the assignment would violate the rules of a seniority system.' 535 U.S. at 403, 122 S. Ct. 1516. There is no seniority system at issue here. However, we suppose it is possible there is some comparable circumstance *of which we are unaware*. We note for completeness that if mandatory reassignment is not ordinarily a reasonable accommodation, the EEOC can still prevail if it shows that special factors make mandatory reassignment reasonable in this case." *Id.* at 764 & n.3 (emphasis added).

[10] Defendant cites to a part of the *Lincoln* decision that discusses a discrimination claim premised on disparate treatment, for which evidence is needed that the employer's discrimination action was because of the employee's disability. With respect to that claim, the Tenth Circuit held that the plaintiff could not show that a failure to transfer showed discrimination because the plaintiff was not the most qualified applicant. But the holding is inapposite to the separate issue of failure to transfer as a reasonable accommodation, for which proof of discriminatory motive is not an issue. Plaintiffs correctly point to a later part of the decision, which holds that reassigning a qualified, disabled employee to a vacant position despite a most-qualified policy is not unreasonable as a matter of law. *Lincoln*, 900 F.3d at 1205.

banc); *see also Shapiro v. Township of Lakewood*, 292 F.3d 356, 361 (3d Cir. 2002) (not addressing a best-qualified policy but rejecting the argument that reassignment as a reasonable accommodation involves nothing more than letting an employee apply for a vacant position like any other applicant).

On the other side of the split, the Eighth Circuit and the Eleventh Circuit[11] have held that reassignment in violation of an employer's best-qualified policy is not reasonable in the run of cases, and the employer is not obligated to do more than "allow a disabled person to compete equally with the rest of the world for a vacant position." *EEOC v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333, 1346 (11th Cir. 2016); *Huber v. Wal-Mart Stores*, 486 F.3d 480, 483 (8th Cir. 2007).[12] The Eleventh Circuit's decision in *St. Joseph's Hospital* does not address the *Barnett* Court's explanation that preferential treatment of disabled employees, despite an employer's disability-neutral rules, is sometimes necessary to effectuate the ADA. Nor does it discuss why mandatory reassignment under a best-qualified policy is ordinarily unreasonable except to point out that businesses are operated for profit and results, which requires efficiency and good performance. *See St. Joseph's*, 842 F.3d at 1346. These general concerns are different from the specific, superior rights of other employees that made reassignment unreasonable in *Barnett*. Also, it is hard to see how these general concerns, applicable to almost all employers in one form or another, would not "swallow the rule" and end-run the ADA if accepted as a basis for unreasonableness. The Eighth Circuit's decision in *Huber* also does not discuss *Barnett* in any depth nor how *Barnett*'s reasoning in relation to seniority systems applies to policies like best-qualified selection. *See Huber*, 486 F.3d at 483-84.

---

[11] The Ninth Circuit decision cited by Defendant is an unpublished decision. *See Gamez-Morales v. Pacific Northwest Renal Services, LLC*, 304 F. App'x 572 (9th Cir. 2008).

[12] *St. Joseph's Hospital* relies on *Huber* and *Huber* in turn relies on *Humiston-Keeling*, 227 F.3d 1024 (7th Cir. 2000), one of the cases the Seventh Circuit held in its *United Airlines* decision was no longer good law in light of *Barnett*.

The court finds the Seventh Circuit's reasoning and analysis to be more sound. Accordingly, it holds that an employer cannot rely merely on the fact that it has a disability-neutral, competitive process in place, and that a disabled employee is allowed to participate in that process, to successfully defend its position that it has provided reasonable accommodation in the form of reassignment. In coming to this conclusion, the court is sensitive to the fact that there are practical considerations on both sides. A rule that allows an employer to fulfill its reasonable accommodation duties by considering—but not necessarily reassigning—a disabled employee because of an established policy like "best-qualified" would mean that employers "could adopt a policy in favor of hiring the most qualified candidate such that a disabled employee could never rely on reassignment to establish the existence of a reasonable accommodation for purposes of his prima facie case. Such a result would effectively and improperly read 'reassignment to a vacant position' out of the ADA's definition of 'reasonable accommodation." *Lincoln*, 900 F.3d at 1205. On the other hand, a rule that mandates an employer to reassign a disabled, qualified employee could undermine the effective operation of the employer and perhaps be used to an improper advantage by employees requesting accommodation. However, the defendant always has the opportunity to show that, on the facts, reassignment in violation of a disability-neutral policy creates undue hardship or rebut the reasonableness of reassignment, as *Barnett*, *United Airlines*, and the other circuit decisions hold. *Barnett*, 535 U.S. at 402; *United Airlines*, 693 F.3d at 764 & n.3; *Reed*, 244 F.3d at 258–60. Furthermore, as the Tenth's Circuit's decision in *Midland Brake* discusses in detail, significant limitations on an employer's obligations are baked into the reasonable accommodation of reassignment. *See Midland Brake*, 180 F.3d at 1170.[13]

---

[13] The *Midland Brake* Court's helpful discussion:

> Congress has already significantly cabined the obligation to offer reassignment to a
> qualified employee who is disabled so as to ensure that it is not unduly burdensome,

Consistent with some of the limitations discussed by the *Midland Brake* court, the First

Circuit has held that a plaintiff who is alleging she should have been reassigned has the burden of

demonstrating that there was an actual vacant position to which she could have been reassigned.

*Audette*, 858 F.3d at 21. An employer is not required to create a new job for an employee, *id.*, to re-

establish a position that no longer exists, *id.*, or to eliminate the essential function of a position or

reallocate the essential function onto another worker, *Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st

Cir. 2006).

       *3.*     *Interactive Process*

When a request for a reasonable accommodation is made, it "may trigger a responsibility on

the part of the employer to enter into an interactive process with the employee to determine an

appropriate accommodation." *Calero-Cerezo*, 355 F.3dat 23–24 (citing *Reed*, 244 F.3d at 262 n.11).

"The scope of the employer's obligation in this process is not crystal clear but '[t]he employer has at

---

        or even particularly disruptive, of an employer's business. *First,* reassignment need be
only to an existing vacant job. Therefore, employers need not create a new job or even
modify an essential function of a vacant job in order to make it suitable for the disabled
employee, because such a reconfigured job is not considered an existing vacant
position. Similarly, if other employees within the company have a legitimate
contractual or seniority right to a vacant position, it is not considered vacant for
reassignment to the disabled employee. *Second,* the employee must be "qualified" for
the vacant position. Although the statute does not require that the employee be the
"best qualified" employee for the vacant position, it at least ensures the employer that
it need not make the reassignment unless the employee is truly qualified to do the
job. *Third,* the reassignment need not involve a promotion, and the employer has the
authority to pick and choose which appropriate vacant job is to be offered to the
otherwise qualified disabled employee. *Fourth,* no reassignment is required if it is not a
"reasonable" accommodation or if it poses an "undue hardship." Congress felt that
these were sufficient safeguards. If further limitations are to be sought, they must come
from Congress.

*Midland Brake*, 180 F.3d at 1176. In addition, the *Midland Brake* court noted other limitations,
including that reassignment perhaps is a reasonable accommodation of last resort (*id.* at 1170-71; *but
see Warren v. United Parcel Serv., Inc.*, 518 F.3d 93, 100 (1st Cir. 2008) (declining to decide whether to
adopt the principle)), and employers are free to choose the reassignment that is to be offered—the
employee is not entitled to the accommodation of her choice, only to a reasonable accommodation
(*id.* at 1177).

least some responsibility in determining the necessary accommodation,' since 'the regulations envision an interactive process that requires participation by both parties.'" *Id.* at 24 (quoting 29 C.F.R. § 1630.2(o)(3)). The interactive process "requires a great deal of communication between the employee and employer." *Id.* (quoting *García-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 n.12 (1st Cir. 2000)). And an "employer's refusal to participate in the process may itself constitute evidence of a violation of the statute." *Id.* (citation omitted). However, where "the employee fails to satisfy her burden of showing a reasonable accommodation existed, the employee cannot maintain a claim for failure to engage in an interactive process." *Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 133 (1st Cir. 2017) (citing *Lang*, 813 F.3d at 456).

### C.    Reasonable Accommodation Under State Law

"A 'qualified handicapped person' is entitled to a 'reasonable accommodation' that will enable him to perform the essential functions of his job, so long as the accommodation does not place an undue burden or hardship on the employer." *Godfrey v. Globe Newspaper Co.*, 928 N.E.2d 327, 333 (Mass. 2010) (citing Mass. Gen. Laws ch. 151B, § 4(16); *Cox v. New England Tel. & Tel. Co.*, 607 N.E.2d 1035 (Mass. 1993)). "Massachusetts state law refers to an individual's 'handicap' rather than her 'disability'—the term favored by the [ADA]. Since there is no substantive difference between the two terms, . . . we use them interchangeably." *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 80 n.2 (1st Cir. 2019) (citing *Ocean Spray Cranberries, Inc. v. MCAD*, 808 N.E.2d 257, 263 n.6 (Mass. 2004)).

"The employee bears the initial burden of producing some evidence that an accommodation that would allow him or her to perform the essential functions of the position would be possible, and therefore that he or she is a 'qualified handicapped person.'" *Godfrey*, 928 N.E.2d at 333. "Once an employee makes at least a facial showing that reasonable accommodation is possible, the burden of proof (of both production and persuasion) shifts to the employer to establish that a suggested accommodation would impose an undue hardship." *Id.* (internal quotation marks omitted). "If the

accommodation proposed by the employee appears unduly onerous, the employer has an obligation to work with the employee to determine whether another accommodation is possible." *Id.*

With respect to disability, Defendant does not dispute for purposes of its motion that any of the Plaintiffs was a "qualified handicapped person," given the interpretation that Mass. Gen. Laws ch. 152, § 75B(1), allows a plaintiff to forgo proof that her physical or mental impairment substantially limited a major life activity. *Malloy*, 460 F.3d at 155.

State law also differs from federal law in that reassignment is not recognized as a reasonable accommodation. Under Massachusetts law, an employer is barred from dismissing employees who are "capable of performing the essential functions *of the position involved* with reasonable accommodation." *Russell v. Cooley Dickinson Hosp., Inc.*, 772 N.E.2d 1054, 1063 (Mass. 2002) (quoting Mass. Gen. Laws ch. 151B, § 4(16)). Therefore, unlike under the ADA, a reasonable accommodation does not include reassignment to vacant positions, and an employer has no duty to reassign a disabled employee to another position. *Id.*; *Andrews v. MBTA*, 872 F. Supp. 2d 108, 114 (D. Mass. 2012). Furthermore, as under the ADA, an employer has no obligation to create a new position for an employee. *Russell*, 772 N.E.2d at 1063; *Godfrey*, 928 N.E.2d at 336-37.

With respect to the interactive process, under state law, an "employee's initial request for an accommodation . . . triggers the employer's obligation to participate in the interactive process of determining one." *Ocean Spray Cranberries*, 808 N.E.2d at 267-68. "If the requested accommodation is not suitable or the request is otherwise inappropriate, the employer nonetheless 'must make a reasonable effort to determine the appropriate accommodation . . . through a flexible, interactive process that involves both the employer and the qualified individual with a disability.'" *Miceli.*, 914 F.3d at 82 (quoting *Russell*, 772 N.E.2d at 1065). But an employer has "no obligation to engage in dialogue concerning a nonexistent possibility of accommodation." *Godfrey*, 928 N.E.2d at 337. And there is "no obligation to undertake an interactive process if an employer can conclusively

25

demonstrate that all conceivable accommodations would impose an undue hardship," although "[s]uch a demonstration . . . will often be difficult to make without the employer's having engaged in an interactive process . . . and having made a good faith effort to explore the options that come out of such a process." *MBTA v. MCAD*, 879 N.E.2d 36, 48 (Mass. 2008).

## V. ANALYSIS

A.    **Reassignment in Light of MERA Is Reasonable on Its Face Under the ADA, and the Accommodation Should Include Something More Than Allowing an SPS Teacher to Participate in the Annual Transfer Process**

A request for reassignment to another school in SPS is reasonable on its face in light of MERA. Under the amendments to MERA, a principal's approval is not required to effectuate a voluntary transfer of a teacher into the principal's school. Instead, the superintendent has the authority over voluntary transfers. The superintendent, as someone who oversees all of the schools in the district, is well-situated to consider how to manage reassignments between schools to comply with federal anti-discrimination requirements and the needs of the district and its schools. The CBA itself recognizes that the superintendent may transfer teachers voluntarily according to the operational needs of the district, which would include the district's need to comply with state and federal law. (CBA § A.pmbl., Dkt. No. 36-5.) In addition, as already discussed, reassignment is explicitly provided as a form of reasonable accommodation under federal law; preferentiality in and of itself, such as a transfer without using the Annual Transfer Process, does not make reassignment unreasonable; and merely allowing a disabled employee to compete for a vacant position like any other employee does not fulfill obligations to reassign as a reasonable accommodation. *See, Barnett*, 535 U.S. at 397–98, 403; *United Airlines*, 693 F.3d at 763–764.

For completeness, the court notes that even if principals had retained authority under MERA after the amendments, it would still find a request for reassignment to another school in SPS to be facially reasonable, both from the perspective of the principal and SPS and from the

perspective of other, non-disabled employees. With respect to the principal and SPS, although
MERA gives principals the prerogative to decide who fills a vacant position, MERA also makes an
exception to that prerogative with respect to involuntary transfers. The existence of involuntary
transfers means principals are already expected under MERA to manage and improve their schools
and be accountable for their performance even if they do not hand-pick every teacher and staff. And
the record shows that these involuntary transfers do in fact occur in SPS to SPS principals. (Reese
Dep. 53:9–54:14, Dkt. No. 62-3 (discussing a seniority system that is used to address a reduction in
positions in the district); CBA § A.pmbl., Dkt. No. 36-5.) With respect to other, non-disabled
employees, a principal's prerogative to decide who fills a vacant position through the Annual
Transfer Process is akin to a best-qualified policy.[14] As the court has already explained, a best-
qualified policy is not analogous to a seniority system and is insufficient on its own to make
reassignment unreasonable.[15]

Because reassignment is reasonable on its face, the burden shifts to Defendant to prove
undue hardship. Undue hardship is a case-specific, fact-intensive question. Defendant has not
presented evidence of undue hardship beyond the existence of MERA, which is not enough,
particularly given the effect of the amendments to MERA. Accordingly, Defendant is not entitled to
summary judgment on the issue of reassignment being a reasonable accommodation.

---

[14] Although there is no official policy stating that principals select the best-qualified applicant,
presumably principals choose from a pool of applicants the person that, in their opinion, will best
contribute to the performance of the school. Even if this is not the case, the analysis does not
change. A completely discretionary approach to hiring confers even fewer expectations or rights in
other employees regarding a position.
[15] Defendant argues that overriding the principal's authority to select the teacher would "be unfair to
the teacher selected by the principal to fill the position." (Opp. to Rodd 9; Dkt. No. 48.) If a teacher
has already been selected, the position is no longer "vacant." If a teacher has not yet been selected
and applicants are in competition for the vacant position, there is no expectation or right like those
discussed in *Barnett* in the context of a seniority system.

**B.** **Plaintiffs' Motion for Summary Judgment on Count V Is Granted;**
**Defendant's Motion for Summary Judgment on Count V Is Denied**

The court grants Plaintiffs' motion for summary judgment with respect to Count V—

Plaintiffs' request for declaratory judgment that "Defendant's reliance on M.G.L. c. 71, Section 59B

of the Education Reform Act in refusing to transfer employees to vacant positions as a reasonable

accommodation is in violation of the ADA"—and denies Defendant's motion for summary

judgment on Count V. As a result of the 2012 amendments, under MERA a superintendent has the

authority to effectuate voluntary transfers even without a principal's approval as long as there has

been a good-faith consultation with the principal. Accordingly, SPS cannot deny reassignment as a

reasonable accommodation based on MERA or the fact a principal does not approve the

reassignment.[16]

The court's decision does not mean that any employee must be transferred regardless of the

employee's disability status or the specifics of each case, as Defendant implies in arguing that the

request for declaratory judgment is overbroad. It also does not mean that reassignment is mandated

for every employee or Plaintiff without context or examination of the facts. The fact-intensive,

burden-shifting *Barnett* framework still applies, and at trial SPS may still rebut the evidence showing

reasonableness or present evidence showing undue hardship.

Lastly, with respect to preemption, Defendant argues "if the Court decides that a forced

transfer, without the principal's permission is a reasonable accommodation under the ADA, the

---

[16] The court notes that even if the power over voluntary transfers remained with the principal under
the amendments to MERA, the court would still deny Defendant's motion for summary judgment
on Count V. As discussed, when the principal had authority over voluntary transfers, the principal
still operated a school with some staff or teachers he or she did not pick for reasons like involuntary
transfers by the district. This fact would be sufficient to support the facial reasonableness of
reassignment without a principal's approval and keep live the issue of whether SPS's reliance on
MERA in refusing to transfer employees to a vacant position as a reasonable accommodation was a
violation of the ADA.

Court would next need to determine that the ADA preempts the authority granted to a principal to make hiring decisions under MERA for the plaintiff to prevail on her declaratory judgment claim." The court's interpretation that the amendments to MERA shifted the authority over voluntary transfers from the principal to the superintendent eliminates this issue of preemption.

### C.     Constance Rodd

Plaintiff Rodd had been an SPS teacher since 2000, as a social studies or English teacher for middle school grades. In 2013, she was involuntarily transferred as a seventh-grade social studies teacher to the Van Sickle Middle School. Within a couple of weeks after her transfer, Rodd began to experience symptoms of wheezing, coughing, congestion, and sneezing that persisted through the 2013-2014 school year. She was diagnosed with a mold allergy in June or July of 2014. During the summer of 2014, she experienced only seasonal allergies, which she had suffered before being transferred to Van Sickle. Upon her return to Van Sickle for the 2014-2015 school year, her symptoms of wheezing and sinus issues came back. She was put on antibiotics and prednisone on a few occasions and was able to continue working.

Prior to the start of her third year at Van Sickle, Rodd attended a professional development session at Van Sickle. Construction was taking place in a room next door causing particles to fly around, and Rodd began to cough. In the first week of September 2015, Rodd submitted a work order to replace classroom ceiling tiles she believed were moldy. A maintenance worker replaced the ceiling tiles while Rodd and her students were in the classroom, and Rodd cleaned up the debris left behind by the maintenance worker. Later that day, she called her doctor because she was having trouble breathing. Her doctor diagnosed her with an exacerbation of asthma and advised her to stay out of work for a period of time. Meanwhile, SPS installed a HEPA filter in her classroom. Rodd returned to work in late September, but worked approximately one week per month in October, November, and December. In December, her doctor wrote a note stating that Rodd was having

difficulty breathing and experiencing shortness of breath and that she could return to work in January 2016. When Rodd returned in January, she immediately began to experience severe breathing issues. Her doctor suspected that Rodd had occupational asthma and advised her to change her work environment to prevent long-term sequelae of her respiratory symptoms.

Rodd submitted a request for transfer to a new building as a reasonable accommodation based on the fact that the mold at Van Sickle was causing her to have breathing difficulties and be absent from her job. Human resources staff Kristin Reardon and Deb Askew informed Rodd that transfer to another school without the principal's agreement to hire her was not a reasonable accommodation because it created an undue hardship for SPS. Reardon advised Rodd to use the Annual Transfer Process to apply to another school and did not discuss other possible accommodations during the meeting. After receiving a letter from SPS notifying her that her request for transfer was denied, Rodd notified Reardon that she would be applying for transfer through the annual transfer process and sought more information about which SPS building might have mold that she could avoid. Reardon told Rodd SPS did not maintain such information and that SPS would begin a termination process if Rodd was not successfully transferred through the Annual Transfer Process. Rodd applied for transfer to five other schools through the Annual Transfer Process and submitted her resume to several other SPS schools. She was interviewed by some of the schools she applied to but was not offered a transfer position.

Rodd was notified by Van Sickle's Matthew Kuzmeskas in June that he intended to terminate her effective July 1, 2016. (Dkt. No. 50-12.) The school did not terminate Rodd, but Rodd decided she had no choice but to retire in October 2016 in order to obtain an income and maintain medical benefits. (Dkt. No. 64-2, at 153-60.)

The court finds that plaintiff has presented sufficient evidence regarding her ADA and Rehabilitation Act claims. SPS does not dispute for purposes of summary judgment that Rodd was

disabled and a qualified individual who could perform the essential functions of the job. The only question is whether SPS failed to reasonably accommodate Rodd by not reassigning her to another building. As already discussed, the court rejects Defendant's arguments as presented that reassignment to another school was unreasonable in light of MERA and that it reasonably accommodated Rodd by allowing her to use the Annual Transfer Process.

SPS's other arguments are also unavailing. Summary judgment is inappropriate based on the fact that SPS provided Rodd with a HEPA filter given that Rodd continued to experience serious breathing issues after the filter was installed. Nor is it appropriate based on SPS's offer to move Rodd to a different classroom since Rodd has presented sufficient evidence to infer that her breathing issues were triggered by the building environment and not just the classroom. Finally, the court cannot see how allowing Rodd to continue her leave for several months until Rodd decided she had no choice but to retire could be a reasonable accommodation.

On Rodd's state claims, the court grants Defendant's motion for summary judgment. Under Massachusetts law, SPS had no duty to transfer or reassign Rodd. And Rodd's argument—that she "was not seeking a transfer to a different position," but rather "to remain a teacher in a different work environment"—is unpersuasive. (Rodd Opp. 14, Dkt. No. 63.) Rodd was seeking to be a teacher in another school to escape the moldy Van Sickle building, which would have required her to transfer to a different position under the plain meaning of "transfer to a different position." Given the nonexistent possibility of accommodation, since transfer to a different position is not available under state law, Rodd does not have a viable interactive process claim.[17]

---

[17] Rodd mentions in her brief the option of transferring "to the other Van Sickle building," but this contradicts her deposition testimony. "Same building, but they're now different schools. So, it's not – you're not assigned to a building. You're assigned to a school. So, at this point, there was Van Sickle Academy, there was Van Sickle IB, and there was the RISE Academy, and then on the further side of the building, you have Renaissance School. So, technically, there were four schools happening in one building." (Rodd Dep. 171:6-13, Dkt. No. 64-2.)

### D.      Mary Jane Eustace

Plaintiff Eustace had been teaching for SPS since 2001. She taught ninth-grade English at the High School of Commerce, a non-alternative school, until 2004, and then twice voluntarily transferred to alternatives schools: Springfield Public Day School, from 2005 to 2013 (English, multiple grades), and then Early College High School from 2013 to 2015 (English and social studies, multiple grades). Springfield Public Day School is for students who have been diagnosed with disabilities that require separate placement from other students. Early College High School provides a credit-recovery program for students who failed too many classes to graduate. Then for the 2015-2016 school year, Eustace was transferred, this time involuntarily, to teach social studies to the seventh and eighth grade at Balliet Middle School, another alternative school, where she taught for one year. (Eustace Dep. 12:1-17:19, 25:15-17, Dkt. No. 62-2.)

Balliet is a school for students with behavioral issues. As Eustace testified:

Kids with problems. People in the community might say problem kids, but kids with problems that could be due to upbringing. . . . They might be in foster care placement. They might have been in and out of lock-up. I had a couple that wore ankle bracelets because they were on probation. And, so, there was a lot of truancy, a lot of class disruptions, a lot of arguing and fighting among the students, a lot of acting out in the classroom. Let's see.

There were numerous occasions, they took – I had my photocopied papers for assignments, for example, laid out on a table for students to pick up as they came in. There were multiple times that students would come in and knock it all to the floor and then maybe run out of the classroom. Students would go through my drawers. Students would throw things at each other and at me. They broke my classroom phone. They would throw my personal belongings out the window.

(Eustace Dep. 22:20-23:16; Dkt. No. 62-2.) The students at Balliet were known to be aggressive toward teachers. Fourteen assault and/or batteries by students against staff had been reported in the previous year. Some other behaviors included class disruptions, arguing and fighting among students, and students blocking teachers from leaving a room. In addition, Eustace was confused as to how she should discipline students given the inconsistencies she perceived in how Balliet

Assistant Principal Sarita Graveline responded to her attempts at discipline. (Eustace Dep. 99:9-103:3, 104:4-107:11, 107:12-108:3, 108:8-110:10, Dkt. No. 62-2.)

On April 11, 2016, Eustace was knocked to the ground while trying to direct a student away from a fight between two other students in the hallway. The same student had hit her arm while she had been directing him into her classroom in March. In the April incident, the student pushed Eustace from the front and caused her to fall. She landed on her hip bone, twisted her back, and used her elbows and hands in an effort to break the fall. Right after being pushed by the student, Eustace felt scared, confused, and unable to express thoughts clearly. Eustace left school and received medical attention.

Two days after the incident, her primary doctor's office noted Eustace was feeling very anxious, stressed, and nervous with some sleeping issues. In addition, Eustace's mental health clinician, Wenda Restall, LICSW, noted that her symptoms were consistent with dissociation and acute posttraumatic stress, her sleep had been affected, and she was feeling exhausted and unable to concentrate. Restall recommended that Eustace remain out of work while undergoing a medical examination and continuing treatment in order to avert a psychological breakdown. For four to six weeks, Eustace continued to be confused, upset, and unable to form clear thoughts or articulate her thoughts. On May 12, 2016, Eustace provided SPS with two documents from her psychiatrist, Dr. Lisa Uyehara. The first noted that Eustace could return to work only in a different school setting given Eustace's persistent posttraumatic symptoms. The second noted that Eustace felt unsafe about returning to the same work environment, and while Eustace's symptoms had improved, they had not resolved fully and were exacerbated by the thought of returning to the same work environment. Although Eustace's symptoms have lessened since leaving Balliet, she claims she has never fully recovered and still experiences symptoms, including anxiety, stress, and trouble sleeping.

In June 2016, Eustace requested as a reasonable accommodation a transfer to a teaching position in social studies or English for any grade five through twelve in any of the non-alternative schools or, in other words, a school with a less volatile student population. Reardon in human resources told Eustace to apply for a transfer to open positions in the district. She also completed a form stating Eustace was not disabled and a transfer to another location would be an undue hardship on the building, staff, and students. Eustace was terminated on August 30, 2016 after not being selected by the principal of any school where she had applied for open positions.

The court finds that Eustace has presented sufficient evidence regarding her ADA and Rehabilitation Act claims. SPS argues that Eustace is not disabled because she has not shown a substantial limitation in her ability to perform a class of jobs or broad range of jobs in various classes as needed to show a substantial limitation to the major life activity of working. The court finds it does not need to reach the issue because Eustace has presented sufficient evidence that her PTSD also impaired her in major life activities other than working, specifically the activities of sleeping, thinking, concentrating, and communicating, so as to create a genuine dispute of material fact regarding her status as disabled.[18] SPS does not dispute that Eustace was a qualified individual who could perform the essential functions of the job. The only question remaining is whether SPS failed to reasonably accommodate Eustace by not reassigning her to another school. As already discussed, the court rejects Defendant's arguments as presented that reassignment to another school was unreasonable in light of MERA and that it reasonably accommodated Eustace by allowing her to use the Annual Transfer Process.

---

[18] In addition, even if the issue turned on whether Eustace has shown that her impairment substantially limited the major life activity of working, the court would find in Eustace's favor for the same reasons discussed for Blank's claims.

On Eustace's state claims, the court grants Defendant's motion for summary judgment for the same reason it grants it for Eustace's claims. Under Massachusetts law, SPS had no duty to reassign Eustace. But Eustace's claims for reasonable accommodation depends on being able to work at a school other than Balliet, which requires reassignment. Given the nonexistent possibility of accommodation, since transfer to a different position is not available under state law, Eustace does not have a viable interactive process claim.

### E.      Deryl Blanks

Plaintiff Blanks had been an SPS teacher since 1978 and is certified to teach elementary education in the subjects of math, English, science, and social studies from kindergarten through eighth grade. In 2011, she was involuntarily assigned to Balliet, the same alternative middle school at which Eustace taught. Blanks also found it challenging to work at Balliet because of the behavioral issues of the students. She received multiple disciplinary actions during her time there for absentism, failure to control and report problematic student behavior, failure to adequately supervise a student during MCAS testing, and for making threatening comments to her students. A meeting was set for February 26, 2014 to investigate Blank's performance, with the possible issuance of disciplinary action including termination, though the meeting does not appear to have occurred.

In or about February 2014, Blanks was diagnosed as suffering from anxiety, high blood pressure, and depression stemming in part from her work with the student population at Balliet. The medical note from her doctor, Dr. Alphonse Calvanese, stated that:

> [Blanks] has been seen on multiple occasions for treatment of anxiety and stress related medical problems related to her workplace. She has had a situational anxiety regarding her fear of threats and failure to discipline students in her work as a teacher and she feels hopeless and fearful about a lack of support in obtaining a controlled environment. She has been treated with medication for her depression and anxiety but given the situational nature of her problems it is advised she obtain a change in her job description or find some level of support for control of the environment. Otherwise, she should is disabled for the current position in view of the extreme level of anxiety and depression she is having requiring medical treatment. Further evaluation with psychological assessment can be obtained in the meantime but it appears that her

problems would be best served by a re assignment of her position or supplying a level of support to remove the perceived threats that she is experiencing.

(Dr. Calvanese Letter, Dkt. No. 40-14.) That month, Blanks went on medical leave for treatment of anxiety and stress and remained on leave for the remainder of the 2013–2014 school year. In April 2014, Blanks wrote a letter to SPS's human resources stating that her "intention is to return to Springfield Public Schools for the 2014–2015 school year. I have applied for a position not inclusive of Balliet Middle School (alternative)." (Blanks Letter dated Apr. 2, 2014, Dkt. No. 40-15.) In April 2014, Blanks applied for a transfer to positions in other SPS elementary schools through the annual voluntary transfer process. She received an interview with one of the schools but was not offered a transfer. In August 2014, Dr. Calvanese wrote a letter stating that Blanks "is able to return to work for the 2014/2015 school year, but not in an Alternative School." (Calvanese Letter dated Apr. 2, 2014, Dkt. No. 40-14.) Blanks would remain on medical leave until the end of the 2016–2017 school year.

In September 2014, Blanks requested an accommodation in the form of a change in job description and reassignment to a position in an elementary school as a support or academic teacher. In October 2014, Blanks met with SPS human resource employees Reardon and Askew to discuss her accommodation request. Blanks was asked if she would consider a teaching position in an alternative elementary school, to which she answered in the negative because she thought she would face the same problems. In October 2014, Blanks was denied her accommodation request to be transferred to a non-alternative school. The decision, as reported by Reardon, was based on finding that Blanks did not have a disability and that the accommodation would require removal of an essential function of the teaching position. In addition, Reardon noted that placement in a non-alternative school was at the sole discretion of the school's principal to hire Blanks and that all schools have "alternative children in them." (Resolution of Reasonable Accommodation Request ¶ 6, Dkt. No. 40-19.) Regarding the possibility of working at an alternative elementary school, which

Case 3:17-cv-30158-MGM   Document 78   Filed 05/29/20   Page 37 of 41

Blanks had rejected, Reardon noted that the option "would be effective as the children could potentially cause less anxiety." (*Id.* ¶ 7.)

In January 2015, SPS advised Blanks to avail herself of the voluntary annual transfer process beginning in March 2015. In or around April 2015, Blanks applied for a transfer to positions in five elementary schools and was not selected for a transfer. In June 2015, SPS offered Blanks the opportunity to apply for open positions outside of the voluntary transfer process. SPS contends that Blanks did not apply for a transfer to any open position, but Blanks asserts that she made telephone calls to the three principals requesting to be interviewed and that she understood her calls to be an application for the positions. Blanks was not hired by any of the principals. Until 2017, she continued to inquire on her own about teaching positions at elementary schools but was not offered a transfer.

In January 2017, SPS again advised Blanks to avail herself of the voluntary annual transfer process beginning in March 2017. In February 2017, after more than 30 years of teaching in SPS, Blanks tendered her resignation effective June 2017. (Blanks Letter, Dkt. No. 40-26.) She explained that her retirement was based on "the understanding that the school district did not offer me a position for the school year 2016-2017, and the sequence of events was similar to prior years in which I notified the school district of my readiness to return to work with accommodations, but was not offered a position (2013-2016)." (*Id.*) She noted she had been on medical leave of absence without pay from 2013 to then. (*Id.*) And she concluded that future efforts to return would be futile and considered her retirement as constructive discharge by SPS. (*Id.*)

The court finds that Blanks has presented sufficient evidence regarding her ADA and Rehabilitation Act claims. SPS argues that Blanks is not disabled because she has not shown that her impairment substantially limits a major life activity. Unlike Eustace, Blanks does not identify any other limitations to major life activities other than working. Therefore, to avoid summary judgment,

Blanks most show that her impairment substantially limits her ability to perform a class of jobs or broad range of jobs in various classes. Some of the caselaw supports Defendant's position that Blanks' restriction from working in alternative schools is not a "class of jobs." But, as discussed, the court is also taking into account the purpose of the ADAAA, and its statutory provision that the "definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). As a result, the court thinks Blanks has sufficiently presented a genuine dispute of material fact regarding her disability, based on her allegation that her depression and anxiety prevented her from working in schools designed to have a higher concentration of students who exhibit aggression and violence. For purposes of summary judgment, SPS does not dispute that Blanks was a qualified individual who could perform the essential functions of the job. And as discussed, the court rejects Defendant's arguments as presented that reassignment to another school was unreasonable in light of MERA and that it reasonably accommodated Blanks by allowing her to use the Annual Transfer Process.

On Blanks' state claims, the court grants Defendant's motion for summary judgment for the same reason it granted it for Rodd's and Eustace's claims.

### F.      Ruth Chappel

Plaintiff Chappel was a full-time middle school science teacher for SPS from 1994 to 2000, a full-time teacher at SPS's environmental center ECOS from 2000 to 2002, a full-time district science resource teacher from 2002 to 2006, and a full-time Instructional Leadership Specialist ("ILS") in science for the district from 2006 to 2012. In the ILS position, twenty percent of Chappel's time was assigned to a specific school location to teach science classes, and the rest of Chappel's time was spent supporting science teachers in various schools. (Chappel Dep. 16:15-20:15, Dkt. No. 58-1.)

Chappel reported to a director of science located in the Central Office rather than a school principal. (*Id.* 19:1-20:24.)

In September 2012, Chappel suffered a work-related injury that resulted in a broken ankle. She had surgery for it and returned to her ILS position in February 2013, on a part-time basis as an accommodation for her medical restrictions. She underwent a second surgery in September 2013 and returned to part-time work around April 2014 until June 2016 when her position was eliminated. At the time, Chappel was limited to working 16 hours per week because of her injured ankle.

Chappel was first informed about the elimination of her position in May 2016 in a meeting with SPS human resources employees Reardon and Melissa Shea. On June 16, 2016, Reardon met with Chappel again in order to obtain information on her restrictions and accommodations relating to her ankle. Reardon advised Chappel to apply for open positions in the district through the regular application process and to set up a meeting with Shea or Tom O'Brien about whether any open positions would meet her needs. (P's Ans. to Interrogs. 16–17; Dkt. No. 35-2.) Chappel emailed O'Brien twice to set up a meeting but received no reply. In August 2016, at an intent to terminate meeting, Chappel's counsel demanded that Chappel be transferred to a part-time position.

In the meantime, Chappel had posted her resume to the district's website, but she did not apply to any specific positions. Her understanding was that she only needed to post her resume as the way to apply for vacancies. In response to her posting, an elementary school principal contacted Chappel about filling one of two full-time science resource teacher positions. Chappel informed the principal that she was limited to 16 hours per week due to her disability and did not hear back again from the principal. Chappel did not receive any other calls in response to the posting of her resume. She did not know of any available part-time science positions in SPS nor of anyone working a part-time science position in the district. However, Chappel testified that sometimes two people shared one position so that both worked part-time. In addition, she testified that she heard a former

elementary science teacher was rehired in a part-time science resources position in August 2016. In March 2019, Chappel received approval of her application for accidental disability retirement benefits, which she had submitted in May 2015.

In light of the record, the court grants Defendant's motion for summary judgment on Chappel's ADA and Rehabilitation Act claims. The court agrees with Defendant that Chappel has not shown that there was an explicitly part-time science position available.[19] Although Chappel testified to her personal knowledge that SPS sometimes employed two people who shared one position (Chappel Dep. Tr. 122:18–125:2, 164:1-8, Dkt. No. 58-1), her testimony lacked specificity regarding details such as what sorts of positions were shared, what factors determined whether a position could be shared, the context in which the shared positions existed, and how prior instances of job-sharing could be applicable to her. Without these types of facts, Chappel's assertion that SPS could have provided a part-time science position for her situation is too speculative, even to support an interactive process claim. Accordingly, Chappel has failed to raise a genuine dispute of material fact regarding her accommodation claims under federal law.

On Chappel's state claims, the court also grants Defendant's motion for summary judgment. Chappel's position had been eliminated and her reasonable accommodation claim necessarily involved another position. Given the nonexistent possibility of accommodation, since reassignment to a different position is not available under state law, Chappel does not have a viable reasonable accommodation or interactive process claim.

## VI. CONCLUSION

For the reasons set forth above, Defendant's motions for summary judgment (Dkt. Nos. 32,

---

[19] And it agrees with Defendant that the evidence regarding the rehiring of a former elementary science teacher as a part-time science resources position in August 2016 is inadmissible hearsay. *Lang v. Wal-Mart Stores East*, 813 F.3d 447, 456 (1st Cir. 2016) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment.").

37, 42, 47) are DENIED-IN-PART with respect to the federal claims under the ADA and Rehabilitation Act of Plaintiffs Rodd, Eustace, and Blanks as well as Plaintiffs' request for declaratory judgment, and GRANTED-IN-PART with respect to the federal claims of Plaintiff Chappel and all Plaintiffs' state claims. Plaintiffs' motion for summary judgment on their request for declaratory judgment (Dkt. No. 52) is GRANTED.

It is So Ordered.

_/s/ Mark G. Mastroianni_
MARK G. MASTROIANNI
United States District Judge